# IN THE UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| BENJAMIN WITTES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 18-0390 (EGS) |
| | ) | |
| UNITED STATES DEPARTMENT | ) | |
| OF STATE, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rule of Civil Procedure, Defendant United States Department of State ("State" or "Defendant"), by and through undersigned counsel, respectfully moves for summary judgment on Plaintiff's claims under the Freedom of Information Act ("FOIA"). This motion is accompanied by a memorandum of law, statement of undisputed material facts, supporting declaration, exhibits, and a proposed order.

Dated:  November 21, 2018

Respectfully submitted,

JESSIE K. LIU
United States Attorney
D.C. Bar #472845

DANIEL VAN HORN
Chief, Civil Division
D.C. Bar #924092

By:     */s/ Jason T. Cohen*
JASON T. COHEN
Assistant United States Attorney
ME Bar #004465
555 Fourth St., N.W.
Washington, D.C. 20530

Phone: (202) 252-2523
Fax: (202) 252-2599
Email: jason.cohen@usdoj.gov

*Counsel for Defendant*

IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| BENJAMIN WITTES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 18-0390 (EGS) |
| | ) | |
| UNITED STATES DEPARTMENT | ) | |
| OF STATE, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

**I.  INTRODUCTION**

Plaintiff, Benjamin Wittes, brought this action pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, as a result of a FOIA request submitted to the United States Department of State  (the "Department," "State," or "Defendant"). Plaintiff seeks agency records pertaining to the alleged use of the Department's official websites and social media accounts to promote the Mar-a-Lago Club. ECF No. 1 at 1.

In response to the request, the Department conducted an adequate and sufficient search of its records and released all reasonably segregable documents to Plaintiff.  The Department located 30 responsive documents, releasing 29 documents in full and one document in part.  The only information withheld was pursuant to FOIA Exemption 5, as the redacted portion consisted of legal advice and  pre-decisional, deliberative information. The information  withheld could not be disclosed without disclosing information warranting protection.  Accordingly, as explained below and demonstrated in the Declaration of Eric F. Stein ("Stein Decl.") and the Exhibits attached

thereto, summary judgment should be entered in favor of Defendant on all counts because there is

no  genuine issue of material fact and Defendant is entitled to dismissal of Plaintiff's claims as a

matter of law.

## II.  STATEMENT OF FACTS

Defendant respectfully refers the Court to its separate, numbered Statement of Material

Facts Not in Dispute for the facts of this case.

## III.  LEGAL STANDARDS

### A.  Standard for Summary Judgment Motion

Summary judgment may be granted where "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). A material fact is one that is capable of affecting the outcome of the litigation. *See*

*Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). A genuine issue is one where the "evidence

is such that a reasonable jury could return a verdict for the non-moving party," *id*., as opposed to

evidence that "is so one-sided that one party must prevail as a matter of law." *Id*. at 252. A court

considering a motion for summary judgment must draw all "justifiable inference" from the

evidence in favor of the non-moving party. *Id*. at 255. The non-moving party, however, must do

more than merely establish some "metaphysical doubt;" rather, that party must come forward with

"specific facts" demonstrating a genuine issue of material fact. *See Matsushita Elec. Indus. Co. v.*

*Zenith Radio Corp.*, 475 U.S. 586-87 (1986); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323

(1986).

### B.  FOIA

FOIA requires federal agencies to release all records responsive to a request for production

unless a specific exemption is applicable. *See* 5 U.S.C. § 552(a)(3)(A), (4)(B) and 5 U.S.C.

§ 552(b). When a FOIA requester properly exhausts his administrative remedies, he may file a civil action challenging an agency's response to its request. *See* 5 U.S.C. § 552(a)(4)(B); *Wilbur v. CIA*, 355 F.3d 675, 677 (D.C. Cir. 2004). Once such an action is filed, the agency generally has the burden of demonstrating that its response to the plaintiff's FOIA request was appropriate. *See id*. at 678.

### C.  Standard for Summary Judgment Motions in FOIA Cases

"FOIA cases are typically decided on motions for summary judgment." *Defenders of Wildlife v. U.S. Border Patrol*, 623 F.Supp.2d 83, 87 (D.D.C. 2009); *see also Kaminsky v. NASA*, No. 08-CV-3313 (ARR), 2010 WL 276184, at *5 (E.D.N.Y. Jan. 19, 2010) ("Summary judgment is the preferred procedure for resolving FOIA disputes."). An agency is entitled to  summary judgment on a FOIA claim where it shows that the documents withheld are "wholly  exempt from the Act's inspection requirements*." Exxon Corp. v. Federal Trade Comm'n*,   663 F.2d 120, 126 (D.C. Cir. 1980). In making that determination, the Court may rely on agency  affidavits so long as they are relatively detailed, non-conclusory and submitted in good faith. *Miller v. U.S. Dep't of State*, 779 F.2d 1378, 1383 (8th Cir. 1985); *Am. Civil Liberties Union v. U.S. Dep't of Defense*, 628 F.3d 612, 619 (D.C. Cir. 2011) ("If an agency's affidavit describes the justifications for withholding the information with specific detail, demonstrates that the information withheld logically falls within the claimed exemption, and is not contradicted by contrary evidence in the record or by evidence of the agency's bad faith, then summary judgment is warranted on the basis of the affidavit alone.").

Further, in FOIA cases, agency affidavits are accorded "a presumption of good faith." *SafeCard Servs., Inc. v. Securities and Exchange Comm'n*, 926 F.2d 1197, 1200 (D.C. Cir.  1991). The fact that the agency did not respond to a FOIA request in a timely manner will not  serve to

justify the Court awarding a requester's motion for summary judgment. *Muhammad v. U.S Customs & Border Protection*, 559 F. Supp. 2d 5, 8 (D.D.C. 2008).

In a FOIA action, a district court has jurisdiction only when an agency has improperly withheld agency records. 5 U.S.C. § 552(a)(4)(B). Here, there are no genuine issues of material fact and the Department of State is entitled to summary judgment as a matter of law.

### D.  Standard of Review in FOIA Cases

FOIA cases are decided using a *de novo* review standard. *See* 5 U.S.C. § 552(a)(4)(B); *see also DOJ v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 755 (1989) (noting that the FOIA "directs the district courts to 'determine the matter *de novo*'" (citing 5 U.S.C. § 552(a)(4)(B)); *Summers v. DOJ*, 140 F.3d 1077, 1080 (D.C. Cir. 1998) (explaining that review is "*de novo*"). Thus, the district court decides *de novo* whether the agency has sustained its burden. *Bloomberg, L.P. v. Bd. of Governors of the Fed. Res. Sys.*, 601 F.3d 143, 147 (2d Cir. 2010).

## IV.  ARGUMENT

### A.  The Department of State Has Fulfilled Its Obligations Under FOIA

Plaintiff brought this action to compel the Department to release information in response to his FOIA request and alleged that information was being improperly withheld.  The Department performed an appropriate search for records responsive to Plaintiff's FOIA request.   The records were processed in accordance with the requirements of FOIA.   Portions of the records were withheld from public disclosure pursuant to Exemption 5.   The Department  has released the segregable responsive documents to Plaintiff.

The Department has thus responded substantively to Plaintiff's FOIA request and has released all records required to be disclosed under FOIA. Accordingly, for the reasons set forth below, summary judgment should be entered in  favor of the Department.

1. **The Department Conducted a Reasonable Search and Properly Responded to Plaintiff's Request**

Under FOIA, an agency must undertake a search that is "reasonably calculated to uncover all relevant documents." *Weisberg v. DOJ*, 705 F.2d 1344, 1351 (D.C. Cir. 1983). A search is not inadequate merely because it failed to "uncover[] every document extant." *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1201 (D.C. Cir. 1991); *see Judicial Watch v. Rossotti*, 285 F. Supp. 2d 17, 26 (D.D.C. 2003) (noting that "[p]erfection is not the standard by which the reasonableness of a FOIA search is measured"). It is appropriate for an agency to search for responsive records in accordance with the manner in which its records systems are indexed. *Greenberg v. Dep't of Treasury*, 10 F. Supp. 2d 3, 13 (D.D.C. 1998).

Where agency affidavits assert that a reasonable search was conducted, the agency is entitled to a presumption of good faith. *Defenders of Wildlife v. U.S. Dep't of Interior*, 314 F. Supp. 2d 1, 8 (D.D.C. 2004). "An agency fulfills its obligations under FOIA if it can demonstrate beyond material doubt that its search was 'reasonably calculated to uncover all relevant documents.'" *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 325 (D.C. Cir. 1999) (quoting *Truitt v. Dep't of State*, 897 F.2d 540, 542 (D.C. Cir. 1990)). FOIA does not require that an agency search every division or field office on its own initiative in response to a FOIA request if responsive documents are likely to be located in one place. *Kowalczyk v. DOJ*, 73 F.3d 386, 388 (D.C. Cir. 1996); *Marks v. DOJ*, 578 F.2d 261, 263 (9th Cir. 1978). Nor does FOIA require that an agency search every record system. *Oglesby*, 920 F.2d at 68.

"To meet its burden, the agency may submit affidavits or declarations that explain in reasonable detail the scope and method of the agency's search." *Defenders of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 91 (D.D.C. 2009). However, "the issue to be resolved is not whether there might exist any other documents possibly responsive to the request, but rather

whether the search for those documents was adequate." *Weisberg v. DOJ*, 745 F.2d 1476, 1485 (D.C. Cir. 1984).  The process of conducting an adequate search for documents requires "both systemic and case-specific exercises of discretion and administrative judgment and expertise," and it is "hardly an area in which the courts should attempt to micromanage the executive branch." *Schrecker v. DOJ*, 349 F.3d 657, 662 (D.C. Cir. 2003) (internal quotation marks and citation omitted).

"[T]he sufficiency of the agency's identification or retrieval procedure" must be "genuinely in issue" in order for summary judgment in the agency's favor to be inappropriate based on the adequacy of the search.  *Weisberg v. DOJ*, 627 F.2d 365, 370 (D.C. Cir. 1980) (quoting *Founding Church of Scientology v. NSA*, 610 F.2d 824, 836 (D.C. Cir. 1979)).  A plaintiff "cannot rebut the good faith presumption" afforded to an agency's supporting affidavits "through purely speculative claims about the existence and discoverability of other documents."  *Brown v. DOJ*, 724 F. Supp. 2d 126, 129 (D.D.C. 2010) (quoting *SafeCard Servs.*, 926 F.2d at 1200); *accord Steinberg v. DOJ*, 23 F.3d 548, 552 (D.C. Cir. 1994) (a plaintiff's "mere speculation that as yet uncovered documents may exist does not undermine the finding that the agency conducted a reasonable search for them").

Moreover, in responding to a FOIA request, an agency looks to the "reasonabl[e] descri[ption]" of the records sought. 5 U.S.C. § 552(a)(3)(A).  That is, a professional agency employee familiar with the subject area must, in light of the FOIA request framed by the requestor, be able to locate the requested records with a "reasonable amount of effort."  H.R. Rep. No. 93-876, at 6 (1974), *reprinted in* 1974 U.S.C.C.A.N. 6271.  The agency must be able to determine "precisely" which records are being requested.  *Tax Analysts v. IRS*, 117 F.3d 607, 610 (D.C. Cir. 1997) (citation and internal quotation marks omitted).  The agency then is obligated to perform a

"reasonable" search in response to the request framed by the requestor. *Meeropol v. Meese*, 790 F.2d 942, 956 (D.C. Cir. 1986); *Zemansky v. EPA*, 767 F.2d 569, 571-73 (9th Cir. 1985). An agency, however, is "not obligated to look beyond the four corners of the request for leads to the location of responsive documents." *Kowalczyk v. DOJ*, 73 F.3d 386, 389 (D.C. Cir. 1996); *see also Williams v. Ashcroft*, 30 Fed. Appx. 5, 6 (D.C. Cir. 2002) (agency need not look for records not sought in initial FOIA request).

Here, there is no material doubt that the searches performed were adequate. After the Department received Plaintiff's FOIA request, the Office of Information Programs and Services ("IPS") determined, based on its knowledge of the responsibilities of the various Department components and its evaluation of the subject matter of the request, that the Department components reasonably likely to maintain responsive records were the Bureau of Public Affairs ("PA") and the Bureau of International Information Programs ("IIP"), and that no other components or records systems were reasonably likely to maintain responsive documents. Stein Decl. ¶ 12.[1] Consistent with its usual practice, the Department relied on the knowledge and expertise of the employees within each bureau to determine the files and locations reasonably likely to house responsive records and the best means of locating such records, as those employees are in the best position to know how their files are organized. *Id*. ¶ 13.

---

[1] The Department did not search for records responsive to paragraph 6 of Plaintiff's request, which sought "records describing the processing of this [FOIA] request" and "prepared in connection with the processing of this request," because those records were not in existence at the time of the request and therefore were not properly part of the request. *See Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 216 (D.C. Cir. 2013) (noting that under FOIA, "the term 'agency records' extends only to those documents that an agency both (1) 'create[s] or obtain[s],' *and* (2) 'contol[s] . . . at the time the FOIA request [was] made") (quoting *U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 144-45 (1989)) (emphasis in original); *see also Lipton v. EPA*, 316 F. Supp. 3d 245, 250 (D.D.C. 2018) ("[T]he ordinary understanding has long been that a 'record' is an existing document or other permanent, preserved account of past events.").

### a. The Bureau of International Information Programs

IIP reviewed Plaintiff's FOIA request and determined that there would be no responsive records other than those produced in response to previous FOIA requests on the same subject. Stein Decl. ¶ 14. Plaintiff, in turn, advised that he was aware of and had access to those documents, and agreed that they need not be produced again in response to this request. *See id.* ¶ 15; *see also* ECF Nos. 9 & 10 ("The parties agreed that State need not produce documents already made public through a separate FOIA request that addresses some of the same subject matter as Plaintiff's request.").

For the previous FOIA requests, all IIP Front Office staff were directed to conduct searches of their email. Stein Decl. ¶ 15. Moreover, the Writer/Editor, Office Director, Senior Advisor, Deputy Coordinator, Front Office Staff Assistant, and Division Chief in IIP, who were knowledgeable of both the FOIA requests and IIP records systems, conducted searches of their emails, electronic documents, phone call records, text messages, faxes, social media, Google Vault, and PD Chat. *Id.* The Office Director for the Office of Policy, Outreach, and Governance also conducted an audit of PD Chat, and the IT Support Specialist conducted a Google Vault administrative search. *Id.* IIP used the following search terms: "Donald Trump," "Trump Organization," "Mar-a-Lago," or "Trump Property" for the date range of January 20, 2017, to April 27, 2017, which was the date range covered by the previous requests. *Id.* Additionally, the Office Director for the Office of Policy, Outreach, and Governance directed IIP personnel to search for any electronic documents, phone call records, text messages, faxes, social media or emails related to the Mar-a-Lago article even if they did not include the search terms listed. *Id.*

In addition, IIP searched all relevant e-mail accounts and project management platforms for November and December 2016, and found no additional responsive records. Stein Decl. ¶ 16.

Moreover, IIP is not reasonably likely to have responsive records dated after April 27, 2017, the date of the removal of the article from Department websites. *Id.*

### b.  The Bureau of Public Affairs

A Special Assistant searched the PA unclassified and classified email archives, the Special Assistant's individual electronic drive, the office shared drive, Google Docs, Basecamp, and Slack using the following terms:  "Mar-a-Lago," "Mar a Lago," or "Winter White House." Stein Decl. ¶ 18.  The date range for these searches, consistent with Plaintiff's FOIA request, was November 8, 2016, through June 19, 2018, the date on which the search was conducted. *Id.*

In sum, the Department's search was reasonable and legally sufficient. Defendant searched the places it reasonably determined were most likely to yield responsive records.

### 2.  <u>The Department Properly Withheld Information under FOIA</u>

The "basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable  to the governed." *National Labor Relations Bd. v. Robbins Tire & Rubber Co.*, 437 U.S. 214,  242 (1978). Nevertheless, the Supreme Court recognized that "Congress sought to reach a workable balance between the right of the public to know and the need of the Government" to  protect certain information. *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989). If the information sought by a requester falls within one or more of the nine FOIA exemptions, it is protected under the statute from being disclosed to the public. 5 U.S.C. § 552(b). In the instant case, consistent with *Vaughn v. Rosen*, 523 F.2d 1136 (D.C. Cir. 1975), the Department redacted information pursuant to Exemption 5 and provided a declaration describing in sufficient detail the information withheld and the basis for withholding. *See, e.g.*, *Joyce v. FBI*, 152 F. Supp. 2d 32, 34 (D.D.C. 2001).

### a. Pursuant To Exemption 5, The Department Properly Withheld Privileged and Deliberative Information

FOIA Exemption 5 protects "inter-agency or intra-agency memorandum or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). This exemption shields records of the type that would be privileged in the civil discovery context, including materials protected by the attorney-client privilege, the attorney work-product privilege, and the executive deliberative process privilege. *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975); *see also Judicial Watch, Inc. v. DOJ*, 365 F.3d 1108, 1113 (D.C. Cir. 2004); *Rockwell Int'l Corp. v. DOJ*, 235 F.3d 598, 601 (D.C. Cir. 2001). Here, the Department withheld information that fell under the attorney-client and deliberative process privileges.

### i. Attorney-Client Privilege

Exemption 5 permits the withholding of information that is protected by the attorney-client privilege. That privilege protects "confidential communications between an attorney and his client relating to a legal matter for which the client has sought professional advice." *Mead Data Cent., Inc. v. U.S. Dep't of the Air Force*, 566 F.2d 242, 252 (D.C. Cir. 1977).

Here, certain information was withheld that consisted of language prepared and recommended by Department attorneys for use by the Department at a particular time in response to specific press inquiries regarding a potential ethics investigation of the Department. Stein Decl. ¶ 21. Such legal advice was intended to be kept confidential and was properly withheld under this privilege.

### ii. Deliberative Process Privilege

Documents covered by the deliberative process privilege and exempt under Exemption 5 include those "'reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.'" *Sears, Roebuck*, 421

U.S. at 150 (quoting *Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena*, 40 F.R.D. 318, 324 (D.D.C.

1966)); *see also McKinley v. FDIC,* 744 F. Supp. 2d 128, 137-38 (D.D.C. 2010). As the Supreme

Court has explained:

> The deliberative process privilege rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news, and its object is to enhance the quality of agency decisions by protecting open and frank discussion among those who make them within the Government.

*Dep't of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8-9 (2001) (internal

quotation marks and citations omitted).

The deliberative process privilege is designed to prevent injury to the quality of agency

decisions by: (1) encouraging open, frank discussions on matters of policy between subordinates

and superiors; (2) protecting against premature disclosure of proposed policies before they are

adopted; and (3) protecting against public confusion that might result from the disclosure of

reasons and rationales that were not in fact ultimately the grounds for an agency's decision. *See

Sears, Roebuck*, 421 U.S. at 151-53; *Coastal States Gas Corp. v. U.S. Dep't of Energy*, 617 F.2d

854, 866 (D.C. Cir. 1980); *Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Homeland

Sec.*, 648 F. Supp. 2d 152, 156 (D.D.C. 2009); *FPL Grp., Inc. v. IRS,* 698 F. Supp. 2d 66, 81

(D.D.C. 2010). Examples of documents covered by the deliberative process privilege include:

recommendations, draft documents, proposals, suggestions, advisory opinions and other

documents such as email messages, that reflect the personal opinions of the author rather than the

policy of the agency or the give and take of the policy making process. *See Bloomberg, L.P. v.

SEC*, 357 F. Supp. 2d 156, 168 (D.D.C. 2004).

To invoke the deliberative process privilege, an agency must show that the exempt

document is both pre-decisional and deliberative. *Access Reports v. DOJ*, 926 F.2d 1192, 1194

(D.C. Cir. 1991); *Coastal States Gas*, 617 F.2d at 868; *Tax Analysts v. IRS*, 117 F.3d 607, 616 (D.C. Cir. 1997). For a document to be pre-decisional, it must be antecedent to the adoption of an agency policy. *See Jordan v. DOJ*, 591 F.2d 753, 774 (D.C. Cir. 1978) (en banc); *see also In re Sealed Case*, 121 F.3d 729, 737 (D.C.Cir.1997) ("The deliberative process privilege does not shield documents that simply state or explain a decision the government has already made[.]"). To show that a document is pre-decisional, however, the agency need not identify a specific final agency decision; it is sufficient to establish "'what deliberative process is involved, and the role played by the documents at issue in the course of that process.'" *Heggestad v. DOJ*, 182 F. Supp. 2d 1, 7 (D.D.C. 2000) (quoting *Coastal States Gas*, 617 F.2d at 868).

A document is "deliberative" if it "'reflects the give-and-take of the consultative process.'" *McKinley*, 744 F. Supp. 2d at 138 (quoting *Coastal States Gas*, 617 F.2d at 866). Thus, "'pre-decisional materials are not exempt merely because they are pre-decisional; they also must be part of the agency give-and-take of the deliberative process by which the decision itself is made.'" *Jowett, Inc. v. U.S. Dep't of the Navy*, 729 F. Supp. 871, 875 (D.D.C. 1989) (quoting *Vaughn v. Rosen*, 523 F.2d 1136, 1144 (D.C Cir. 1975)). The privilege protects factual material if it is "inextricably intertwined" with deliberative material, *FPL*, 698 F. Supp. 2d at 81, or if disclosure "would 'expose an agency's decision-making process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions.'" *Quarles v. Dep't of Navy*, 893 F.2d 390, 392 (D.C. Cir. 1990)) (quoting *Dudman Commc'ns Corp. v. Dep't of Air Force*, 815 F.2d 1565, 1568 (D.C. Cir. 1987)). "The 'key question' in identifying 'deliberative' material is whether disclosure of the information would 'discourage candid discussion within the agency.'" *Access Reports*, 926 F.2d at1195 (quoting *Dudman*, 815 F.2d at 1567-68).

Here, the Department sufficiently explained that the redacted material is both pre-decisional and deliberative. The material was pre-decisional in that it was prepared and recommended for use preceding the Department's decision about what to say in response to press inquiries, and deliberative in that it was one option prepared as part of the process of deciding what the Department should say in response to the inquiries. Stein Decl. ¶ 21. Release of the redacted information would be likely to chill open and frank discussion, including with legal personnel, about options for the Department's responses to other inquiries. Thus, the Department properly invoked Exemption 5 to withhold records covered by the deliberative process privilege.

### 3.   <u>The Department Properly Produced All Segregable Records</u>

FOIA requires that, if a record contains information that is exempt from disclosure, any "reasonably segregable," non-exempt information must be disclosed after redaction of the exempt information unless the non-exempt portions are "inextricably intertwined with exempt portions." 5 U.S.C. § 552(b); *Mead Data Cent., Inc. v. Dep't of Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977); *Kurdyukov v. U.S. Coast Guard*, 578 F. Supp. 2d 114, 128 (D.D.C. 2008). "Agencies are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material," which must be overcome by some "quantum of evidence" by the requester. *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007).

As explained in the Stein Declaration, the Department withheld only part of one document pursuant to FOIA Exemption 5. The Department conducted a line-by-line review of this material and determined that there is no information that can be reasonably segregated and released without disclosing information warranting protection under FOIA. Stein Decl. ¶ 21-22. Therefore, the Court should find that the Department has properly complied with the duty to segregate exempt from non-exempt information.

## V.   CONCLUSION

WHEREFORE, for all of the reasons set forth above, Defendant respectfully requests that the   Court grant its Motion for Summary Judgment, enter judgment in favor of Defendant, and dismiss this case with prejudice.

Dated:  November 21, 2018                     Respectfully submitted,

                                              JESSIE K. LIU, D.C. Bar #472845
                                              United States Attorney

                                              DANIEL VAN HORN, D.C. Bar #924092
                                              Chief, Civil Division

                              By:      _/s/ Jason T. Cohen_
                                              JASON T. COHEN, ME Bar #004465
                                              Assistant United States Attorney
                                              555 Fourth St., N.W.
                                              Washington, D.C. 20530
                                              Phone: (202) 252-2523 / Fax: (202) 252-2599
                                              Email: jason.cohen@usdoj.gov

                                              _Counsel for Defendant_

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| BENJAMIN WITTES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 18-0390 (EGS) |
| | ) | |
| UNITED STATES DEPARTMENT OF STATE, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**DEFENDANT'S STATEMENT OF MATERIAL FACTS NOT IN DISPUTE**

Pursuant to Local Rule 7(h) and the Court's Standing Order (ECF No. 3), Defendant U.S.

Department of State (the "Department" or "Defendant") respectfully submits this Statement of

Material Facts Not in Dispute in support of its Motion for Summary Judgment.

**I.      Plaintiff's Request and Administrative History Related to the Request**

| | |
|---|---|
| 1.       On May 16, 2017, Plaintiff submitted a Freedom of Information Act ("FOIA") request to the Department seeking:<br><br>   1.  All records, including but not limited to emails, notes, and memoranda, relating to how any Department of State webpages, including those webpages operated by U.S. Embassies and Consulates, came to discuss, reference, promote or report on Trump National Golf Club Mar-a-Lago (hereinafter "Mar-a-Lago"), from November 8, 2016 until the date that a search is conducted for records responsive to this FOIA request.  This includes, but is not limited to the following | |

webpages:
https://share.america.gov/mar-a-lago-winter-white-house/, and
https://uk.usembassy.gov/mar-lago-winter-white-house/.

2. All records reflecting communications (including but not limited to emails, telephone call logs, calendar entries, meeting agendas, or text messages) between the Department of State and the Executive Office of the President, any other federal agency, any political committee, or any private organization relating to public communications about Mar-a-Lago.  The timeframe for this request is from January 20, 2017 until the date that a search is conducted for records responsive to this request.

3. All records, including but not limited to emails, notes and memoranda relating to the removal on April 24, 2017, of any article dealing with or discussing Mar-a-Lago from Department of State webpages, from November 8, 2016 until the date that a search is conducted for records responsive to this FOIA request.

4. All records, including but not limited to emails, notes, and memoranda, relating to requests for photos of Mar-a-Lago, from November 8, 2016 until the date that a search is conducted for records responsive to this FOIA request.

5. All records, including but not limited to emails, notes, and memoranda, relating to the sharing of information about Mar-a-Lago on Department of State, U.S. Embassy, and U.S. Consulate social media accounts, including but not limited to Twitter, Instagram, and Facebook. This request incudes records related to any Facebook Post about Mar-a-Lago on April 5, 2017 at 10:30 am by the Department of Sate: Economic and Business Affairs (@EconatState) account.

6. In addition to the records requested above, I also request records describing the processing of this request, including records sufficient to identify search terms used and locations and custodians searched and tracking sheets used to track the processing of this request. If your agency uses FOIA questionnaires or certifications completed by individual custodians or components to determine whether they possess responsive materials or to describe how they conducted searches, I also request any such records prepared in connection with the processing of this request.

Plaintiff's request covered the time period from November 8, 2016, to present. Declaration of Eric F. Stein ("Stein Decl.") ¶ 4 & Exh. 1.

| | |
|---|---|
| 2. By letter dated June 9, 2017, the Department's Office of Information Programs and Services ("IPS") acknowledged receipt of Plaintiff's FOIA request and assigned it Case Control Number F-2017-12470. Stein Decl. ¶ 5 & Exh. 2. | |
| 3. By letter dated August 15, 2018, the Department informed Plaintiff that the search of Department records had resulted in the retrieval of four responsive documents.  The Department released all four documents in full. Stein Decl. ¶ 7. | |
| 4. By letter dated September 12, 2018, the Department informed Plaintiff that the search of Department records had resulted in the retrieval of an additional 16 responsive documents.  The Department released 15 documents in full and 1 document in part. Stein Decl. ¶ 8. | |
| 5. By letter dated October 16, 2018, the Department informed Plaintiff that the search of Department records had resulted in the retrieval of an additional 10 responsive documents.  The Department released all 10 documents in full. Stein Decl. ¶ 9. | |

## II.     The Department's Search for Responsive Records

| | |
|---|---|
| 6. Based on its knowledge of the responsibilities of the various Department components, together with an evaluation of | |

4

| | |
|---|---|
| the subject matter of Plaintiff's requests, IPS determined that the Department components reasonably likely to maintain responsive records were the Bureau of Public Affairs ("PA") and the Bureau of International Information Programs ("IIP"). Stein Decl. ¶ 12. | |
| 7.      IPS concluded that no other components or records systems were reasonably likely to maintain documents responsive to Plaintiff's requests, and that the tasked components searched all files reasonably likely to contain relevant documents. *Id.* | |
| 8.      IPS did not search for records described in paragraph 6 of Plaintiff's request that pertain to the processing of the request itself, as it is well-established that a FOIA request may only seek documents that were in existence at the time a request was received and/or at the time searches were conducted. *Id.* | |

A.      **Bureau of International Information Programs**

| | |
|---|---|
| 9.      IIP reviewed the FOIA request and determined that there would be no responsive records other than those previously produced in response to other similar FOIA requests. Stein Decl. ¶¶ 14, 15, & 16. Plaintiff advised that those records could be excluded from the production. *See* ECF Nos. 9 & 10. | |
| 10.      In earlier cases, IIP personnel conducted searches to locate responsive records related to the Mar-a-Lago article referenced in this FOIA request. Stein Decl. ¶ 15. | |
| 11.      The Office Director for the Office of Policy, Outreach and Governance directed all IIP Front Office staff to conduct searches of their email.  Stein Decl. ¶ 15. Moreover, the Writer/editor, Office Director, Senior Advisor, Deputy Coordinator, Front Office Staff Assistant and Division Chief in IIP, who were knowledgeable of both the FOIA requests and IIP records systems, conducted searches of their emails, electronic documents, phone call records, text messages, faxes, social media, Google Vault and PD chat. *Id*.  The Office Director for the Office of Policy, Outreach and Governance also conducted an audit of PD Chat. *Id*.  The IT Support Specialist conducted a Google Vault administrative search.  *Id.*  IIP used the | |

| | |
|---|---|
| following search terms:  "Donald Trump", "Trump Organization", "Mar-a-Lago" or "Trump Property" for the date range of January 20, 2017, to April 27, 2017, which was the date range covered by the previous requests. *Id*. Additionally, the Office Director for the Office of Policy, Outreach and Governance directed IIP personnel to search for any electronic documents, phone call records, text messages, faxes, social media or emails related to the Mar-a-Lago article even if they did not include the search terms listed. *Id*. | |
| 12.     In addition, IIP searched all relevant e-mail accounts and project management platforms for November and December 2016 and found no additional responsive records. Stein Decl. ¶ 16. | |
| 13.     IIP is not reasonably likely to have responsive records dated after April 27, 2017, the date of the removal of the article from Department websites. *Id*. | |
| 14.     The Office Director for Policy, Outreach and Governance for IIP advised IPS that IIP personnel rarely use the classified system and most personnel do not have access to the classified system.  Therefore, searches were only conducted on the unclassified system. *Id*. | |

### B.      The Bureau of Public Affairs

| | |
|---|---|
| 15.     A Special Assistant in PA conducted searches of the PA unclassified and classified email archives, the Special Assistant's individual electronic drive, the office shared drive, Google Docs, Basecamp, and Slack using the following terms: "Mar-a-Lago," "Mar a Lago," or "Winter White House." Stein Decl. ¶ 18. | |
| 16.     The date range for these searches was November 8, 2016, through June 19, 2018, the date on which the search was conducted. Stein Decl. ¶ 18. | |

## III.    Withholdings

| | |
|---|---|
| 17.     The Department located 30 responsive documents.  The Department released 29 documents in full and one document in part. Stein Decl. ¶ 22. | |
| 18.     Document C06630870 is part of an eight-page, intra-agency e-mail exchange dated April 24, 2017, with the subject lines "Mar a Lago" and "Press Highlights / April 25." Stein Decl. ¶ 21. | |
| 19.     The Department released C06630870 in part, withholding two paragraphs under FOIA Exemption 5 pursuant to the deliberative process and  attorney-client privileges. Stein Decl. ¶ 21. | |

| | |
|---|---|
| 20.     The redacted portion consists of legal advice from Department attorneys to their clients, specifically language the attorneys prepared and recommended that the Department use at a particular time in response to specific press inquiries regarding a potential ethics investigation of the Department.  *Id*. | |
| 21.     This legal advice was intended to be kept confidential, and that confidentiality has been maintained.  *Id*. | |
| 22.     In addition, the redacted portion is pre-decisional in that it was prepared and recommended for use preceding the Department's decision about what to say in response to the press inquiries, and it is deliberative in that it was one option prepared as part of the process of deciding what the Department should say in response to the inquiries.  *Id*. | |
| 23.     Release of the redacted information would harm the Department's process of responding to press inquiries by chilling open and frank discussion, including with legal personnel, about options for the Department's responses. *Id*.  Department personnel would be less likely to prepare multiple options for responses to the press if such options, whether adopted or not, would be disclosed. *Id*. | |

## IV.     Segregability

| | |
|---|---|
| 24.     The Department carefully reviewed all documents addressed herein for reasonable segregation of non-exempt information and implemented segregation when possible. Stein Decl. ¶ 22. | |
| 25.     With respect to the one document in which the Department withheld information pursuant to FOIA Exemption 5, the Department conducted a line-by-line review of this material and determined there is no information that can be reasonably segregated and released. Stein Decl. ¶ 21. | |

Respectfully submitted,

JESSIE K. LIU, D.C. Bar #472845
United States Attorney

DANIEL F. VAN HORN, D.C. Bar #924092
Chief, Civil Division

By:     _/s/ Jason T. Cohen_
JASON T. COHEN, ME Bar #004465
Assistant United States Attorney
Civil Division
555 Fourth St., N.W.
Washington, D.C. 20530
Phone: (202) 252-2523
Fax: (202) 252-2599
Email: jason.cohen@usdoj.gov

_Counsel for Defendant_

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| ) | |
| BENJAMIN WITTES ) | |
| ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 18-0390 (EGS) |
| ) | |
| ) | |
| DEPARTMENT OF STATE ) | |
| ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

## DECLARATION OF ERIC F. STEIN

Pursuant to 28 U.S.C. § 1746, I, Eric F. Stein, declare and state as follows:

1.      I am the Director of the Office of Information Programs and Services ("IPS") of

the United States Department of State (the "Department" or "State") and have served in this

capacity since January 22, 2017.  Previously, I served as the Acting Director since October 16,

2016, and as the Acting Co-Director since March 21, 2016.  I am the Department official

immediately responsible for responding to requests for records under the Freedom of Information

Act (the "FOIA"), 5 U.S.C. § 552, the Privacy Act of 1974, 5 U.S.C. § 552a, and other records

access provisions.  Prior to serving in this capacity, I worked directly for the Department's

Deputy Assistant Secretary ("DAS") for Global Information Services ("GIS") and served as a

senior advisor and deputy to the DAS on all issues related to GIS offices and programs, which

include IPS.  As the Director of IPS, I have original classification authority and am authorized to

classify and declassify national security information.  I make the following statements based

1

upon my personal knowledge, which in turn is based upon information furnished to me in the course of my official duties.  I am familiar with the efforts of Department personnel to process the subject request, and I am in charge of coordinating the agency's search and recovery efforts with respect to that request.

2.      The core responsibilities of IPS include: (1) responding to records access requests made by the public (including under the FOIA, the Privacy Act, and the mandatory declassification review requirements of the Executive Order governing classified national security information), by Members of Congress, by other government agencies, and those made pursuant to judicial process such as subpoenas, court orders, and discovery requests; (2) records management; (3) privacy protection; (4) national security classification management and declassification review; (5) corporate records archives management; (6) research; (7) operation and management of the Department's library; and (8) technology applications that support these activities.

3.      This declaration explains the Department's search for and review of records responsive to the FOIA request at issue in this litigation and the FOIA exemptions applied to the withholdings.

## I.  ADMINISTRATIVE PROCESSING OF PLAINTIFF'S FOIA REQUEST

### Request F-2017-12470

4.      On May 16, 2017 (Exhibit 1), Plaintiff submitted a FOIA request to the Department seeking:

> 1.   All records, including but not limited to emails, notes, and
>       memoranda, relating to how any Department of State
>       webpages, including those webpages operated by U.S.
>       Embassies and Consulates, came to discuss, reference, promote
>       or report on Trump National Golf Club Mar-a-Lago
>       (hereinafter "Mar-a-Lago"), from November 8, 2016 until the

2

date that a search is conducted for records responsive to this
FOIA request.  This includes, but is not limited to the
following webpages: https://share.america.gov/mar-a-lago-
winter-white-house/, and https://uk.usembassy.gov/mar-lago-
winter-white-house/.

2.  All records reflecting communications (including but not
    limited to emails, telephone call logs, calendar entries, meeting
    agendas, or text messages) between the Department of State
    and the Executive Office of the President, any other federal
    agency, any political committee, or any private organization
    relating to public communications about Mar-a-Lago.  The
    timeframe for this request is from January 20, 2017 until the
    date that a search is conducted for records responsive to this
    request.

3.  All records, including but not limited to emails, notes and
    memoranda relating to the removal on April 24, 2017, of any
    article dealing with or discussing Mar-a-Lago from Department
    of State webpages, from November 8, 2016 until the date that a
    search is conducted for records responsive to this FOIA
    request.

4.  All records, including but not limited to emails, notes, and
    memoranda, relating to requests for photos of Mar-a-Lago,
    from November 8, 2016 until the date that a search is
    conducted for records responsive to this FOIA request.

5.  All records, including but not limited to emails, notes, and
    memoranda, relating to the sharing of information about Mar-
    a-Lago on Department of State, U.S. Embassy, and U.S.
    Consulate social media accounts, including but not limited to
    Twitter, Instagram, and Facebook.  This request incudes
    records related to any Facebook Post about Mar-a-Lago on
    April 5, 2017 at 10:30 am by the Department of Sate:
    Economic and Business Affairs (@EconatState) account.

6.  In addition to the records requested above, I also request
    records describing the processing of this request, including
    records sufficient to identify search terms used and locations
    and custodians searched and tracking sheets used to track the
    processing of this request.  If your agency uses FOIA
    questionnaires or certifications completed by individual
    custodians or components to determine whether they possess

3

responsive materials or to describe how they conducted searches, I also request any such records prepared in connection with the processing of this request.

5.      By letter dated June 9, 2017 (Exhibit 2), IPS acknowledged receipt of Plaintiff's

FOIA request and assigned it Case Control Number F-2017-12470.

6.      Plaintiff filed suit on February 21, 2018.

7.      By letter dated August 15, 2018 (Exhibit 3), the Department informed Plaintiff

that the search of Department records had resulted in the retrieval of four responsive documents.

The Department released all four documents in full.

8.      By letter dated September 12, 2018 (Exhibit 4), the Department informed Plaintiff

that the search of Department records had resulted in the retrieval of an additional 16 responsive

documents.  The Department released 15 documents in full and 1 document in part.

9.      By letter dated October 16, 2018 (Exhibit 5), the Department informed Plaintiff

that the search of Department records had resulted in the retrieval of an additional 10 responsive

documents.  The Department released all 10 documents in full.

## II. THE SEARCH PROCESS

10.     When the Department receives a FOIA request, IPS evaluates the request to

determine which offices, overseas posts, or other records systems within the Department may

reasonably be expected to contain the records requested.  This determination is based on the

description of the records requested and requires a familiarity with the holdings of the

Department's records systems, applicable records disposition schedules, and the substantive and

functional mandates of numerous Department offices and Foreign Service posts and missions.

4

11.     Each office within the Department, as well as each Foreign Service post and mission, maintains files concerning foreign policy and other functional matters related to the daily operations of that office, post, or mission.  These files consist generally of working copies of documents, information copies of documents maintained in the Central Foreign Policy Records collection, and other documents prepared by or furnished to the office in connection with the performance of its official duties, as well as electronic copies of documents and e-mail messages.

12.     Based on its knowledge of the responsibilities of the various Department components, together with an evaluation of the subject matter of Plaintiff's requests, IPS determined that the Department components reasonably likely to maintain responsive records were the Bureau of Public Affairs ("PA") and the Bureau of International Information Programs ("IIP").  IPS concluded that no other components or records systems were reasonably likely to maintain documents responsive to Plaintiff's requests and that the tasked components searched all files reasonably likely to contain relevant documents.  IPS did not search for records described in paragraph 6 of Plaintiff's request that pertain to the processing of the request itself, as it is well-established that a FOIA request may only seek documents that were in existence at the time a request was received and/or at the time searches were conducted.

13.     When conducting a search in response to a FOIA request, the Department relies on the knowledge and expertise of the employees of each bureau/office/post to determine the files and locations reasonably likely to house responsive records and the best means of locating such records, as these employees are in the best position to know how their files are organized.  Likewise, those employees are also in the best position to determine which search terms would

yield potentially responsive records, because they are most knowledgeable about the organization of the records systems in use.

## Bureau of International Information Programs

14.     The Bureau of International Information Programs ("IIP") supports people-to-people conversations with foreign publics on U.S. policy priorities.  To carry out this mission, IIP leverages digital communications technology to reach across platforms, from traditional forms of communications to new media channels.  IIP takes a strategic, data-driven approach to develop multimedia, digital communications products and to manage an overseas network of bricks-and-mortar American Spaces.  The Office of American Spaces develops and supports modern, advanced physical platforms or public diplomacy engagement with foreign audiences for these American Spaces, with more than 650 locations worldwide.  Whether discussions take place in person or in virtual spaces, IIP's top goal is to connect people with policy through dialogue that is relatable and understandable.  In addition to IIP's ongoing programs, the Bureau stands up timely special focus communications campaigns that respond to emerging issues.  IIP reviewed the FOIA request, determined that there would be no responsive records other than those produced in response to previous FOIA request.

15.     For the previous FOIA request, IIP personnel conducted a search to locate records related to the Mar-a-Lago article referenced in this FOIA request.  The Office Director for the Office of Policy, Outreach, and Governance directed all Front Office staff to conduct a search of their email.  Moreover, the Writer/Editor, Office Director, Senior Advisor, Deputy Coordinator, Front Office Staff Assistant, and Division Chief in IIP, who were knowledgeable of both the FOIA request and IIP records systems, conducted a search of their emails, electronic documents, phone call records, text messages, faxes, social media, Google Vault as well as PD chat, which is

6

a collaborative messaging platform used by IIP.  The Office Director for the Office of Policy,

Outreach, and Governance also conducted an audit of PD Chat.  Google Vault is the repository

containing messages sent or received using employees' America.gov email accounts.  The IT

Support Specialist conducted a Google Vault administrative search.  IIP used the following

search terms: "Donald Trump," "Trump Organization," "Mar-a-Lago," or "Trump Property" for

the date range of January 20, 2017, to April 27, 2017, which was the date range covered by the

previous request.  Additionally, the Office Director for the Office of Policy, Outreach, and

Governance directed IIP personnel to search for any electronic documents, phone call records,

text messages, faxes, social media or emails related to the Mar-a-Lago article, even if they did

not include the search terms listed.  Responsive records were located as a result of this search.

Plaintiff advised that he had obtained documents from a prior FOIA request and agreed that State

need not produce those documents.

     16.     In addition to the search detailed above, IIP searched all relevant e-mail accounts

and project management platforms for November and December 2016, and found no additional

responsive records.  Moreover, IIP is not reasonably likely to have responsive records dated after

April 27, 2017, the date of the removal of the article from Department websites.  Therefore, IIP

would have no responsive records other than what had already been processed in response to the

previous request.  The Office Director for Policy, Outreach and Governance for IIP advised IPS

that IIP personnel rarely use the classified e-mail system and most personnel do not have access

to the classified system.  Therefore, an e-mail search was only conducted on the unclassified

system.

**The Bureau of Public Affairs**

17.     The mission of the Bureau of Public Affairs ("PA") is to communicate timely and accurate information to international and domestic media with the goal of furthering U.S. foreign policy and national security interests, as well as broadening the understanding of American values.  To achieve these objectives, PA uses a wide range of media platforms, conducts public outreach, and provides historical perspective through the Office of the Historian.

18.     Basecamp is a project management tool used by PA to assign and track projects. It includes notes from project participants and sends workflow alerts for process steps, for instance, when an article moves from the writing phase to photos, or photos to editing.  Google Docs is an online word processor that lets the user create and format documents and share the documents with others.  Slack is a workspace tool used for instant messaging, file-sharing, and project collaboration.  A Special Assistant searched the PA unclassified and classified email archives, the Special Assistant's individual electronic drive, the office shared drive, Google Docs, Basecamp, and Slack using the following terms: "Mar-a-Lago," "Mar a Lago," or "Winter White House."  The date range for this search, consistent with Plaintiff's FOIA request, was November 8, 2016, through June 19, 2018, the date on which the search was conducted.

**III.  FOIA EXEMPTIONS CLAIMED**

**FOIA Exemption 5 – Attorney Client Privilege**

19.     5 U.S.C. § 552(b)(5) states that the FOIA does not apply to:

> inter-agency or intra-agency memoranda or letters which would
> not be available by law to a party other than an agency in litigation
> with the agency....

20.     Exemption 5, 5 U.S.C. § 552(b)(5), protects from disclosure information that is normally privileged in the civil discovery context, including information that is protected by the

8

deliberative process and the attorney-client privileges.  The deliberative process privilege

protects the confidentiality of candid views and advice of U.S. Government officials in their

internal deliberations related to policy formulation and administrative direction.  For example,

certain information withheld in this case reflects the internal exchange of ideas and

recommendations that occurred when Department officials were formulating a strategy for how

to respond to certain press inquiries.  Disclosure of information could reasonably be expected to

chill the open and frank exchange of comments and opinions that occurs between Department

officials.  In addition, disclosure of these details would hamper the ability of responsible

Department officials to formulate and carry out executive branch programs.  The Department

also withheld this information under the attorney-client privilege to protect communications

between attorneys and their clients for the purpose of seeking and/or providing legal advice.

These communications were intended to be kept confidential and that confidentiality has been

maintained.

## DOCUMENT DESCRIPTION

21.     **Documents C06630870, C06630564, C06630567, and C06630568**[1] are together

an eight-page, intra-agency email exchange dated April 24, 2017, with the subject lines "Mar a

Lago" and "Press Highlights / April 25."  (These were 4 of the 30 documents located and

determined responsive to Plaintiff's request.)  Documents C06630564, C06630567, and

C06630568 (Exhibits 7-9) were released in their entirety.  The Department released C06630870

(Exhibit 6) in part, withholding two paragraphs under FOIA Exemption 5, 5 U.S.C. § 552(b)(5),

pursuant to the deliberative process and attorney-client privileges.  The redacted portion consists

---

[1] This email was inadvertently separated into four different records and assigned distinct
tracking numbers, even though they are part of the same email.

of legal advice from Department attorneys to their clients, specifically language the attorneys prepared and recommended that the Department use at a particular time in response to specific press inquiries regarding a potential ethics investigation of the Department.  This legal advice was intended to be kept confidential, and that confidentiality has been maintained.  In addition, the withheld information is pre-decisional in that it was prepared and recommended for use preceding the Department's decision about what to say in response to the press inquiries, and it is deliberative in that it was one option prepared as part of the process of deciding what the Department should say in response to the inquiries.  Release of the redacted information would harm the Department's process of responding to press inquiries by chilling open and frank discussion, including with legal personnel, about options for the Department's responses. Department personnel would be less likely to prepare multiple options for responses to the press if such options, whether adopted or not, would be disclosed.  The Department conducted a line-by-line review of the document and determined there is no additional information that can be reasonably segregated and released.  Please note that the attachment, C06630866 (Exhibit 10), was released in full.

## IV. CONCLUSION

22.      In summary, the Department searched all locations reasonably likely to contain documents responsive to Plaintiff's FOIA request.  The Department located 30 responsive documents.  The Department released 29 documents in full and 1 document in part.  The Department carefully reviewed all documents addressed herein for reasonable segregation of non-exempt information and implemented segregation when possible.  Otherwise, the

Department determined that no segregation of additional meaningful information in the documents could be made without disclosing information warranting protection under the law.

\*\*\*

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this **21st** day of November 2018, Washington, D.C.

Eric F. Stein

11

# BROOKINGS

1775 Massachusetts Avenue, NW
Washington, DC 20036
telephone   202.797.6000
fax          202.797.6004
web          brookings.edu

May 16, 2017

F-2017-12470

Kellie Robinson, Public Liaison
U. S. Department of State
A/GIS/IPS/PP
SA-2, Suite 8100
Washington, D. C. 20522-0208
RobinsonKN@state.gov

Re: Freedom of Information Act Request

Dear FOIA Officer:

Pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. § 552, I hereby request that your office produce within 20 business days the following records (see below for clarity on the types of records sought):

1.  All records, including but not limited to emails, notes, and memoranda, relating to how any Department of State webpages, including those webpages operated by U.S. Embassies and Consulates, came to discuss, reference, promote or report on Trump National Golf Club Mar-a-Lago (hereinafter "Mar-a-Lago"), from November 8, 2016 until the date that a search is conducted for records responsive to this FOIA request. This includes, but is not limited to the following webpages: https://share.america.gov/mar-a-lago-winter-white-house/, and https://uk.usembassy.gov/mar-lago-winter-white-house/.

2.  All records reflecting communications (including but not limited to emails, telephone call logs, calendar entries, meeting agendas, or text messages) between the Department of State and the Executive Office of the President, any other federal agency, any political committee, or any private organization relating to public communications about Mar-a-Lago. The timeframe for this request is from January 20, 2017 until the date that a search is conducted for records responsive to this request.

3.  All records, including but not limited to emails, notes, and memoranda relating to the removal, on April 24, 2017, of any article dealing with or discussing Mar-a-Lago from Department of State webpages, from November 8, 2016 until the date that a search is conducted for records responsive to this FOIA request.

4.  All records, including but not limited to emails, notes, and memoranda, relating to requests for photos of Mar-a-Lago, from November 8, 2016 until the date that a search is conducted for records responsive to this FOIA request.

5.  All records, including but not limited to emails, notes, and memoranda, relating to the sharing of information about Mar-a-Lago on Department of State, U.S. Embassy, and U.S. Consulate social media accounts, including but not limited to Twitter, Instagram, and Facebook. This request

Stein Declaration
Civil Action No. 18-cv-00390
Exhibit 1                                          1

# BROOKINGS

1775 Massachusetts Avenue, NW
Washington, DC 20036
telephone  202.797.6000
fax  202.797.6004
web  brookings.edu

includes records related to any Facebook Post about Mar-a-Lago on April 5, 2017 at 10:30 am by the Department of State: Economic and Businesses Affairs (@EconatState) account.

6. In addition to the records requested above, I also request records describing the processing of this request, including records sufficient to identify search terms used and locations and custodians searched and any tracking sheets used to track the processing of this request. If your agency uses FOIA questionnaires or certifications completed by individual custodians or components to determine whether they possess responsive materials or to describe how they conducted searches, I also request any such records prepared in connection with the processing of this request.

## FEE WAIVER

FOIA provides that any fees associated with a request are waived if "disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester." 5 U.S.C. § 552(a)(4)(A)(iii).

I am the Editor-in-Chief of *Lawfare*, an online publication dedicated to informing public understanding on operations and activities of the government. *Lawfare* is published by The Lawfare Institute, a 501(c)(3) not-for-profit educational organization, and in cooperation with The Brookings Institution, a 501(c)(3) nonprofit public policy organization. This request is submitted in connection with *Lawfare*'s mission to publish information that is likely to contribute significantly to the public understanding of executive branch activities related to law and national security. *Lawfare* does not have commercial interests.

In addition to satisfying the requirements for a waiver of fees associated with the search and processing of records, I am entitled to a waiver of all fees except "reasonable standard charges for document duplication." 5 U.S.C. § 552(a)(4)(A)(ii)(II). Federal law mandates that fees be limited to document duplication costs for any requester that qualifies as a representative of the news media. *Id. Lawfare* is a "news media organizations." Its purpose is to "gather information of potential interest to a segment of the public, use its editorial skills to turn the raw materials into distinct work, and distribute that work to an audience." *Nat's Sec. Archive v. Dep't of Defense*, 880 F.2d 1381, 1387 (D.C. Cir. 1989). We intend to give the public access to documents transmitted via FOIA on our website, https://www.lawfareblog.com, and to provide information about and analysis of those documents as appropriate.

## RESPONSIVE RECORDS

We ask that all types of records and all record systems be searched to discover records responsive to our request. We seek records in all medium and format. This includes, but is not limited

2

# BROOKINGS

1775 Massachusetts Avenue, NW
Washington, DC 20036
telephone   202.797.6000
fax   202.797.6004
web   brookings.edu

to: agendas, manifests, calendars, schedules, notes, and any prepared documentation for meetings, calls, teleconferences, or other discussions responsive to our request; voicemails; e-mails; e-mail attachments; talking points; faxes; training documents and guides; tables of contents and contents of binders; documents pertaining to instruction and coordination of couriers; and any other materials. We ask that you search all systems of record, including electronic and paper, in use at your agency. We also ask that you search files or emails in the personal custody of your employees, such as personal email accounts, as required by FOIA and to the extent that they are reasonably likely to contain responsive records. We would prefer records in electronic format, saved as PDF documents, and transmitted via email or CD-ROM.

We ask that you search for records from all components of the Department of State that may be reasonably likely to produce responsive results, including but not limited to the Office of the Under Secretary for Public Diplomacy and Public Affairs, the Bureau of International Information Programs, the Bureau of Economic and Business Affairs, the Bureau of Administration, the Bureau of Budget and Planning, the Bureau of Public Affairs: Office of Digital Engagement, and the Bureau of Public Affairs: Office of International Media Engagement.

If you make a determination that any responsive record, or any segment within a record, is exempt from disclosure, we ask that you provide an index of those records at the time you transmit all other responsive records. In the index, please include a description of the record and the reason for exclusion with respect to each individual exempt record or exempt portion of a record, as provided by *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), cert. denied, 415 U.S. 977 (1974). When you deem a portion of a record exempt, we ask that the remainder of the record to be provided, as required by 5 U.S.C. § 552(b).

Given the 20-day statutory deadline, we hope to be as helpful as possible in clarifying or answering questions about our request. Please contact me by phone or email if you require any additional information. I appreciate your cooperation, and look forward to hearing from you very soon.

Sincerely,

/s/ Benjamin Wittes

Benjamin Wittes
Senior Fellow in Governance Studies, The Brookings Institution
Editor in Chief, *Lawfare*
1775 Massachusetts Ave NW
Washington D.C. 20036
Phone: (202) 797- 4368
benjamin.wittes@gmail.com

3

To view a High Resolution & Color copy of this fax:

1. Go to www.hellofax.com/HighRes

2. Enter Access Code: | fd530aa371 |

19297778428   → 12022618579

21775 Massachusetts Avenue NW
Washington DC 20036
Phone: (202) 797-6000
Fax: (202) 797-6004



# FAX

To Whom It May Concern:

Please see the enclosed fax transmission. If you have questions about the contents of the fax, please reach out via the contact information below.

We appreciate your prompt attention to this matter, and look forward to hearing from you soon.

Sincerely,

/s/ Benjamin Wittes

Senior Fellow in Governance Studies, The Brookings Institution
Editor in Chief, *Lawfare*
Phone: (202) 797-4368
benjamin.wittes@gmail.com

C06347894



United States Department of State

*Washington, D.C. 20520*

**JUN 0 9 2017**

Dear Requester,

RE: Any/all DoS records/correspondence/web page/photos referencing/discussing Mar-a-Lago

This is in response to your request dated __05/16/2017__, which was received on __06/01/2017__. We have assigned Case Control Number __F-2017-12470__ and will begin the processing of your request based upon the information provided in your communication.

The cut-off date is the date the search is initiated unless you have provided a specific timeframe.

Unusual circumstances (including the number and location of Department components involved in responding to your request, the volume of requested records, etc.) may arise that would require additional time to process your request.

We will notify you as soon as responsive material has been retrieved and reviewed.

Should you have any questions, you may call our FOIA Requester Service Center at (202) 261-8484 or send an email to FOIAstatus@state.gov. Please refer to the Case Control Number in any communication.

Sincerely,

Requester Communications Branch
Office of Information Programs & Services

Stein Declaration
Civil Action No. 18-cv-00390
Exhibit 2

*Office of Information Programs and Services*
*U.S. Department of State, SA-2*
*Washington, DC 20522-8100*
*Website: www.foia.state.gov*

*Inquiries:*
*Phone: 1-202-261-8484*
*FAX: 1-202-261-8579*
*E-mail: FOIAStatus@state.gov*

C06347894

### Fee Waiver

Your request for a fee waiver has been granted; therefore, your request will be processed at no charge to you.



**United States Department of State**

*Washington, D.C. 20520*

August 15, 2018

Case No. F-2017-12470

Mr. Benjamin Wittes
The Brookings Institution
1775 Massachusetts Ave NW
Washington, DC 20036

Dear Mr. Wittes:

In response to your request dated May 16, 2017, under the Freedom of Information Act
(the "FOIA"), 5 U.S.C. § 552, the Department of State has located four documents
responsive to your request.  After reviewing these documents, we have determined that
all four documents may be released in full.  All released material is enclosed.

Processing of documents potentially responsive to your request remains ongoing.  If you
have any questions, you may contact Assistant U.S. Attorney Jason Cohen, at (202) 252-
2523 or Jason.Cohen@usdoj.gov.  Please be sure to refer to the case number, F-2017-
12470, and the civil action number, 18-cv-0390, in all correspondence about this case.

Sincerely,

Eric F. Stein, Director
Office of Information Programs and Services

Enclosures:  As stated.

Stein Declaration
Civil Action No. 18-cv-00390
Exhibit 3



**United States Department of State**

*Washington, D.C.  20520*

September 12, 2018

Case No.: F-2017-12470
Segment: PA/EX-0003

Mr. Benjamin Wittes
The Brookings Institution
1775 Massachusetts Ave NW
Washington, DC 20036

Dear Mr. Wittes:

In response to your request dated May 16, 2017, under the Freedom of Information Act (the "FOIA"), 5 U.S.C. § 552, the Department of State has located 16 documents responsive to your request.  After reviewing these documents, we have determined that 15 documents may be released in full and 1 may be released in part.

An enclosure explains the FOIA exemptions and other grounds for withholding material. Where we have made excisions, the applicable FOIA exemptions are marked on each document.  All non-exempt material that is reasonably segregable from exempt material has been released in the enclosed pages.

The processing of documents potentially responsive to your request is ongoing.  If you have any questions, you may contact Assistant U.S. Attorney Jason Cohen, at (202) 252-2523 or Jason.Cohen@usdoj.gov.  Please be sure to refer to the case number, F-2017-12470, and the civil action number, 18-cv-0390, in all correspondence about this case.

Sincerely,

*Susan C. Weetman* For

Eric F. Stein, Director
Office of Information Programs and Services

Enclosures:  As stated.

Stein Declaration
Civil Action No. 18-cv-00390
Exhibit 4

The Freedom of Information Act (5 USC 552)

FOIA Exemptions

(b)(1)   Information specifically authorized by an executive order to be kept secret in the interest of national defense or foreign policy.  Executive Order 13526 includes the following classification categories:

    1.4(a)  Military plans, systems, or operations
    1.4(b)  Foreign government information
    1.4(c)  Intelligence activities, sources or methods, or cryptology
    1.4(d)  Foreign relations or foreign activities of the US, including confidential sources
    1.4(e)  Scientific, technological, or economic matters relating to national security, including defense against transnational terrorism
    1.4(f)  U.S. Government  programs for safeguarding nuclear materials or facilities
    1.4(g)  Vulnerabilities or capabilities of systems, installations, infrastructures, projects, plans, or protection services relating to US national security, including defense against transnational terrorism
    1.4(h)  Weapons of mass destruction

(b)(2)   Related solely to the internal personnel rules and practices of an agency

(b)(3)   Specifically exempted from disclosure by statute (other than 5 USC 552), for example:

| | |
|---|---|
| ARMSEXP | Arms Export Control Act, 50a USC 2411(c) |
| CIA PERS/ORG | Central Intelligence Agency Act of 1949, 50 USC 403(g) |
| EXPORT CONTROL | Export Administration Act of 1979, 50 USC App. Sec. 2411(c) |
| FS ACT | Foreign Service Act of 1980, 22 USC 4004 |
| INA | Immigration and Nationality Act, 8 USC 1202(f), Sec. 222(f) |
| IRAN | Iran Claims Settlement Act, Public Law 99-99, Sec. 505 |

(b)(4)   Trade secrets and confidential commercial or financial information

(b)(5)   Interagency or intra-agency communications forming part of the deliberative process, attorney-client privilege, or attorney work product

(b)(6)   Personal privacy information

(b)(7)   Law enforcement information whose disclosure would:
    (A)  interfere with enforcement proceedings
    (B)  deprive a person of a fair trial
    (C)  constitute an unwarranted invasion of personal privacy
    (D)  disclose confidential sources
    (E)  disclose investigation techniques
    (F)  endanger life or physical safety of an individual

(b)(8)   Prepared by or for a government agency regulating or supervising financial institutions

(b)(9)   Geological and geophysical information and data, including maps, concerning wells

**Other Grounds for Withholding**

NR   Material not responsive to a FOIA request excised with the agreement of the requester



**United States Department of State**

*Washington, D.C.  20520*

October 16, 2018

Case No. F-2017-12470
Segments: PA/EX-0002
PA/EX-0004

Mr. Benjamin Wittes
The Brookings Institution
1775 Massachusetts Ave NW
Washington, DC 20036

Dear Mr. Wittes:

In response to your request dated May 16, 2017, under the Freedom of Information Act (the "FOIA"), 5
U.S.C. § 552, the Department of State has located 10 documents responsive to your request. After
reviewing these documents, we have determined that all 10 documents may be released in full. All
released material is enclosed.

This completes the processing of your request. If you have any questions, you may contact Assistant
U.S. Attorney Jason Cohen, at (202) 252-2523 or Jason.Cohen@usdoj.gov. Please be sure to refer to the
case number, F-2017-12470, and the civil action number, 18-cv-0390, in all correspondence about this
case.

Sincerely,

Corynne Gerow for

Susan C. Weetman
Chief, Programs and Policies Division
Office of Information Programs and Services

Enclosures:  As stated.

Stein Declaration
Civil Action No. 18-cv-00390
Exhibit 5

RELEASE IN PART B5

NO DISCERNIBLE CLASSIFICATION

## Starr, Katherine L

| | |
|---|---|
| **From:** | Stroh, Mark E |
| **Sent:** | Tuesday, April 25, 2017 4:03 PM |
| **To:** | Starr, Katherine L; Johnston, Amy L |
| **Subject:** | Mar a Lago |
| **Attachments:** | PG 20170425 IIP Mar a Lago Article FINAL.docx |

And further, attached is the PG document we prepared for Toner cleared by IIP and L..

Below is an answer L developed while we were prepping after news broke that common cause announce their intention to request an ethics investigation.

B5

This email is UNCLASSIFIED.

**From:** Starr, Katherine L
**Sent:** Tuesday, April 25, 2017 4:02 PM
**To:** Johnston, Amy L; Stroh, Mark E
**Subject:** RE: PRESS HIGHLIGHTS | APRIL 25

This from DPB today (from unedited copy):

**QUESTION:** Topic two: I want to get to – try and get to the bottom of this IIP Mar-a-Lago post thing. I take it that you have looked into what happened, and I'm hoping you'll be able to answer these questions. Was there in place at the time it was posted some kind of a vetting process to determine whether something met or did not meet muster according to the ethics rules? If there was, was it approved? And if there wasn't, was it – is there a process now in place? And did anyone take a look at it after the fact and determine that it was or was not a breach of the ethics rules?

**MR TONER:** Okay, I think I can answer all of those questions, or at least try to. First of all, we didn't get into this yesterday, but for those who may not know on the line, Share America is a digital platform of the State Department Bureau of International Information Programs, and it advances U.S. foreign policy by providing our missions abroad with social media content in order to engage foreign audiences. So this is an outward-directed bureau. And these stories are intended to help audiences, foreign audiences, learn more about the U.S.,

Stein Declaration
Civil Action No. 18-cv-00390    1
Exhibit 6

C06630870 U.S. Department of State Case No. F-2017-12470 Doc No. C06630870 Date: 09/12/2018

NO DISCERNIBLE CLASSIFICATION

including stories about some of the places that they may have heard mentioned in the news. And that, of course, brings us to Mar-a-Lago.

In – excuse me – with respect to your specific questions, Matt – so this article was researched and written by staff members of the IIP Bureau, and that is what they do. As I said, they are creating content to go out to send out to missions around the world. And it was not reviewed at the time it was sent out.

What we did review after the questions in the story came up yesterday – and just in answer to your – sorry, just one other point to make is, as a general matter, IIP content generated for Share America is not reviewed outside of the bureau, outside of IIP. Moving forward, in light of this story, we're going to consider whether any additional review of content is needed or appropriate.

**QUESTION:** Okay. And going forward – well, sorry, is there precedent for this kind of thing? You said it's for foreign audiences about places they're heard in the news. Do know if there is precedent for privately owned facilities to be featured on this or other State Department platforms, either for-profit or non-profit, for-profit meaning like maybe the Waldorf Hotel or the Palace Hotel now in New York, the places where presidents meet foreign leaders, or non-profit like President Bush's ranch in Crawford or Sunnylands even, where President Obama met with foreign leaders? Have these places been profiled?

**MR TONER:** So again, so Share America has only been in existence for two years. We're looking back to see if the actual bureau, IIP, the International Information Programs, has done similar articles in the past, because that's been their mandate for some time. Again, to try to write stories pertaining to places of interest or in the news to foreign audiences.

All I could do – we did a quick search of Share America, the articles that they have written. None really pertains to the questions you've asked about – with respect to locales. I mean, some of the things are – some of the types of articles are secretaries of state hail from many different walks of life, how presidents leave their mark on the Oval Office, how much do you know about U.S. presidents – kind of fact-based but interesting articles to foreign audiences who are trying to learn more about the U.S. Government. But specifically, I don't know that there have been any articles pertaining to either publicly owned or privately owned properties.

**QUESTION:** Okay. Well, was it – was there a determination made about the Mar-a-Lago post that it was not promotional in nature or it did not violate any ethics rules? Was that made? And going forward, suppose – and I realize this is hypothetical, but the President owns numerous private places where he could have meetings – golf clubs, other hotels for example. Is there going to be a ban or anything like – a review of anything that involves those – those issues?

And then I have two more questions on two different topics, and I'll lump them together really quickly. One, I'm wondering about a readout of the JCPOA meeting in Vienna. And secondly, do you have anything to say about the Turkey – the Turkish military strikes on Kurdish positions in Syria and Iraq? And that's it for me.

**MR TONER:** All right, great. Thanks, Matt. Okay, let me start with the – or finish, rather, with the Mar-a-Lago story, and then we'll get to the other questions. So it was reviewed. It was determined that this article was, and it's our contention that it was, meant to provide historical information and context relevant to the conduct of U.S. diplomacy and was not intended to endorse or promote any private enterprise.

That said, we did make the decision – the department made the decision – to remove the article in light of some of the feedback we were getting about the article's purpose, or rather misperceptions about its purpose, and I think going forward the department's going to consider whether any additional review of Share America's content is appropriate. We obviously take ethics obligations of our employees very seriously, so we're looking at it. And we recognize that while there was no, obviously, malice of forethought with respect to this article; it

UNCLASSIFIED U.S. Department of State Case No. F-2017-12470 Doc No. C06630870 Date: 09/12/2018

C06630870  U.S. Department of State  Case No. F-2017-12470  Doc No. C06630870  Date: 09/12/2018

NO DISCERNIBLE CLASSIFICATION

was simply intended to inform foreign audiences about places they've been hearing about in the news pertinent to U.S. foreign policy and the President's activities, I think going forward we're going look at how we can tighten up our review process to ensure there's no — any — or no greater confusion or no more confusion about some of the content on there.

Official - Transitory
UNCLASSIFIED

From: Johnston, Amy L
Sent: Tuesday, April 25, 2017 4:00 PM
To: Stroh, Mark E
Cc: Starr, Katherine L
Subject: RE: PRESS HIGHLIGHTS | APRIL 25

Hi Mark — can you send us points on Mar a Lago? I have the statement from last night but just seeing if we have something more. Thanks.

Official
UNCLASSIFIED

From: Stroh, Mark E
Sent: Tuesday, April 25, 2017 8:00 AM
To: Trudeau, Elizabeth K; Peterlin, Margaret JA; Ciccone, Christine M; Hammond, Robert C; Macmanus, Joseph E
Cc: Miller, Andrea R; Hazelton, Jennifer L; Toner, Mark C; Stevenson, Susan N; Piazza, Lucia C; Laine, Andrew J; Wilezol, David C; Greenan, Robert J; Brown, Cynthia A; Reeser, Tiffany R; Johnston, Amy L; Stroh, Mark E
Subject: PRESS HIGHLIGHTS | APRIL 25

Press Highlights – April 25, 2017

S and Department Issues

* **Mar-a-Lago:** Wash Post: State Department website removes article touting history of Trump's Mar-a-Lago estate; NY Times: US Embassies Post Article Extolling Trump's Mar-a-Lago; Bloomberg: Trump's "Winter White House" Mar-a-Lago Showcased On State Department Site; AP: State Department Removes Promotion Of Trump's Mar-a-Lago

* **Foreign Aid:** Foreign Policy: The End of Foreign Aid As We Know It

* **Personnel:** WSJ: Former Fox Anchor Heather Nauert Is New State Department Spokeswoman; AP: State Department Names Former Fox News Anchor As Spokeswoman; Foreign Policy: State Department Gets New Spokesperson From 'Fox and Friends'

White House / NSC Issues

UNCLASSIFIED  U.S. Department of State  Case No. F-2017-12470  Doc No. C06630870  Date: 09/12/2018

C06630870 U.S. Department of State Case No. F-2017-12470 Doc No. C06630870 Date: 09/12/2018

**NO DISCERNIBLE CLASSIFICATION**

- **North Korea:** WSJ: Trump Urges U.N. To "Solve The Problem" Of North Korea's Weapons Program; AP: Haley Warns NKorea About Attacking US Base Or Testing ICBM; AP: North Korea Quiet Amid Expectation Of Missile Follow-up; NY Times: As North Korea Speeds Its Nuclear Program, US Fears Time Will Run Out; Wash Post: North Korea carries out huge live-fire drills as U.S. warships gather; Reuters: North Korea stages large-scale artillery drill as U.S. submarine docks in South; Foreign Policy: Could Playing Chicken With North Korea Pay Off?; Wash Post: Senate staff perplexed by unusual White House private briefing on North Korea; Reuters: Entire U.S. Senate to go to White House for North Korea briefing

- **Iran:** AFP: Iran Nuclear Deal Reviewed As Uncertainty Grows; AP: Trump Asked to Work for Release of 2 Jailed by Iran

- **Budget:** Wash Post: White House "Confident" Of Averting Shutdown As Trump Shows Flexibility On Wall; NY Times: Republicans Agree On No Shutdown, But Not On How To Avoid One

- **Canada Tariff:** WSJ: Trump Administration Plans To Impose 20% Tariff On Canadian Softwood-Lumber Imports

- **Germany:** Bloomberg: Ivanka Trump Goes To Berlin As Merkel Seeks White House Conduit

- **Turkey / Armenia:** AP: Trump Recalls Killing Of Armenians, Doesn't Call It Genocide; AFP: US Irks Turkey, Says No Policy Change On Armenian Bloodletting

- **100 Days:** Wash Post: Trump's First 100 Days Have Been Rocky At Home. Abroad, They're Cause For Relief.

- **Other:** Politico: Trump's prisoner dilemma; Politico: No replacement yet for McFarland

**Hot Spots**

- **Syria:** NY Times: U.S. Imposes Sanctions On Syrian Government Workers After Sarin Attack; NY Times: U.N. Documents Syrian War Crimes, But Prosecution Moves Slowly; Reuters: Air Strikes Kill at Least 12, Damage Hospital in Syria's Idlib-Medics, Monitor

- **Iraq:** AP: Iraqi Troops Capture Largest Neighborhood In Western Mosul

- **Turkey / Iraq / Syria:** AP: Turkey hits Kurdish areas in Iraq's Sinjar, northeast Syria

- **France / Russia:** NY Times: Russian Hackers Who Targeted Clinton Appear To Attack France's Macron

- **Russia:** AP: Russian Foreign Minister: No Proof Of Persecution Of Gay Men

- **Philippines:** NY Times: Charge Rodrigo Duterte With Mass Murder, Lawyer Tells The Hague

- **Afghanistan / Russia:** AP: US General In Afghanistan Suggests Russia Arming The Taliban

- **Venezuela:** NY Times: Venezuela Opposition Aims To Keep Protests Peaceful, But Violence Erupts

UNCLASSIFIED U.S. Department of State Case No. F-2017-12470 Doc No. C06630870 Date: 09/12/2018

NO DISCERNIBLE CLASSIFICATION

- **Sudan / South Sudan:** AFP: S.Sudan Hosting Rebels To 'Extend War' In Sudan: Security

**S and Department Issues**

**Mar-a Lago**

**Wash Post: State Department website removes article touting history of Trump's Mar-a-Lago estate**
**By Anne Gearan**

The State Department on Monday removed from its website an article about the history and lavish furnishings of President Trump's privately owned Florida resort club Mar-a-Lago, following questions about whether the federal government improperly promoted Trump's moneymaking enterprises.

Sen. Ron Wyden (D-Ore.) pointed to the travelogue-style blog piece Monday, asking in a Twitter message why the State Department would spend "taxpayer $$ promoting the president's private country club."

The State Department issued a statement Monday apologizing for "any misperception."

"The intention of the article was to inform the public about where the president has been hosting world leaders," the statement said.

It was not clear whether the item had been vetted for legal or ethical concerns.

The short item had been posted on a promotional website called "Share America" on April 4, ahead of Trump's meeting at Mar-a-Lago with Chinese President Xi Jinping. A version of the item was recently reposted on the website maintained by the U.S. Embassy in London, where it caught the attention of watchdog groups.

The item adopted Trump's term "winter White House" for the ¬members-only club. It did not expressly encourage foreigners to visit Mar-a-Lago, although other articles on the same website actively promote U.S. tourism. The item did note that the estate "is located at the heart of Florida's Palm Beach community."

"By visiting this 'winter White House,' Trump is belatedly fulfilling the dream of Mar-a-Lago's original owner and designer," the item read. "The ornate Jazz Age house was designed with Old-World Spanish, Venetian and Portuguese influences" and filled with original owner Marjorie Merriweather Post's collection of antiques, the article noted.

The item included photographs of the house and sumptuous interiors, and copies of Trump tweets mentioning Mar-a-Lago.

The article gave a brief summary of the 1927 mansion's history, including Post's desire that it be used by U.S. presidents as a retreat and the subsequent decision by the U.S. government that the property was too expensive to maintain. Trump bought it in 1985.

"After refurbishing the house and adding an events space, Trump opened the estate to dues-paying members of the public in 1995 as the Mar-a-Lago Club," the State Department item read. "Post's dream of a winter White House came true with Trump's election in 2016. Trump regularly works out of the house he maintains at Mar-a-Lago and uses the club to host foreign dignitaries."

One watchdog group, American Oversight, called for an investigation by the State Department inspector general and said it would request public records documenting how the blog post was created.

The State Department describes the "Share America" site as its "platform for sharing compelling stories and images that spark discussion and debate on important topics like democracy, freedom of expression, innovation, entrepreneurship, education, and the role of civil society."

The site is produced by the department's Bureau of International Information Programs, which produces material distributed by U.S. embassies.

**NY Times: US Embassies Post Article Extolling Trump's Mar-a-Lago**
**By Gardiner Harris**

NO DISCERNIBLE CLASSIFICATION

UNCLASSIFIED  U.S. Department of State  Case No. F-2017-12470  Doc No. C06630870  Date: 09/12/2018

C06630564  U.S. Department of State  Case No. F-2017-12470  Doc No. C06630564  Date: 09/12/2018

NO DISCERNIBLE CLASSIFICATION

RELEASE IN FULL

WASHINGTON —— The State Department is tasked with promoting American interests abroad, but marketing a private club owned by the president of the United States has not generally been part of its official duties —— until now.

An article posted on many United States Embassy websites around the world gave a visitors' guide to Mar-a-Lago, President Trump's club in Palm Beach, Fla., that has become something of a "winter White House" because of his frequent visits there. Its presence set off critics quick to look for conflicts of interest between the president and his businesses.

The article was taken down late Monday from the State Department's ShareAmerica site, but it has remained on some embassy sites. A note in its place says, "The intention of the article was to inform the public about where the president has been hosting world leaders. We regret any misperception and have removed the post."

The article had a straightforward description of the resort. "When socialite and cereal heiress Marjorie Merriweather Post built Mar-a-Lago —— Spanish for 'Sea to Lake' —— in 1927, she spared no expense," it said. "The 114-room mansion sits on eight hectares of land, with the Atlantic Ocean on one side and an inland waterway on the other."

It went on to say that Ms. Post willed the estate to the federal government, hoping it would become a vacation home for presidents. But when no president used it that way, the government gave it back. The article noted that Mr. Trump bought the estate in 1985; he opened it to dues-paying members in 1995. His visits there have "finally" fulfilled Ms. Post's dream, the article stated.

On Twitter, the article quickly became fodder for critics.

"As the WH plans deep cuts to hunger programs and foreign aid, so nice to see taxpayer money being used responsibly...to promote Mar-a-Lago," wrote Representative Mark Takano, Democrat of California.

Senator Ron Wyden, Democrat of Oregon, said on Twitter, "Why are taxpayer $$ promoting the president's private country club?" He later posted the article, saying, "Here's the full post in its kleptocratic glory."

At an afternoon briefing at the State Department, Mark Toner, a department spokesman, said he had no information about why the article was created and posted by embassies around the world. After a quick check, posts were seen on embassy websites and Facebook pages in Britain and Albania.

Presidential scholars and ethics lawyers have, since the beginning of the Trump administration, stated concerns about how Mr. Trump and his family separate their personal business interests from the president's official duties.

The ShareAmerica site, where the Mar-a-Lago article first appeared in early April, contains articles on various aspects of American culture, including the first lady, the Detroit auto show, cheetah cubs and Mahogany Jones, a rapper.

### Bloomberg: Trump's "Winter White House" Mar-a-Lago Showcased On State Department Site
### By Bill Allison

The U.S. State Department pulled down a page on an official website that had showcased President Donald Trump's private club, Mar-a-Lago, after it raised questions about a potential conflict of interest.

The posting, dated April 4, called the club the "Winter White House." It detailed the history of the property "located at the heart of Florida's Palm Beach community," including Trump's purchase of it in 1985. The posting was published on ShareAmerica.gov, a State Department website that promotes the U.S. abroad and also appeared in an abbreviated form on the official site of the U.S. embassy to the U.K.

Lawmakers and the government's top ethics official have criticized Trump for not divesting from his businesses, arguing that his holdings pose conflicts of interest. The Trump Organization doubled the price of memberships at Mar-a-Lago to $200,000 a year in January.

In response to the State Department's posting, Senator Ron Wyden, a Democrat from Oregon, asked in a tweet Monday, "Why are taxpayer $$ promoting the President's private country club?"

By Monday evening, the posting on Mar-a-Lago had been removed and replaced with a statement: "The intention of the article was to inform the public about where the President has been hosting world leaders. We regret any misperception and have removed the post."

Cereal Heiress

Stein Declaration
Civil Action No. 18-cv-00390
Exhibit 7

UNCLASSIFIED  U.S. Department of State  Case No. F-2017-12470  Doc No. C06630564  Date: 09/12/2018

C06630567  U.S. Department of State  Case No. F-2017-12470  Doc No. C06630567  Date: 09/12/2018

NO DISCERNIBLE CLASSIFICATION   **RELEASE IN FULL**

The ShareAmerica.gov posting had described the ornate décor of the 114-room mansion, which was built in 1927 by cereal heiress Marjorie Merriweather Post. The State Department said in the posting that when Trump acquired the property, he "bought the decorations and furnishings that Post had collected over the years, preserving Mar-a-Lago's style and taste."

"Why would these officials choose to put out communications praising Mar-a-Lago when it's so clearly a conflict?" asked John Wonderlich, executive director of the Sunlight Foundation, which promotes government transparency. He said the posting was a "clearly inappropriate" use of government resources. "It goes into the history of Mar-a-Lago, but not the historic presidential conflict of interest."

Trump has twice hosted world leaders at the club so far: President Xi Jinping of China and Prime Minister Shinzo Abe of Japan. In February, Senator Elizabeth Warren called on the Government Accountability Office to review whether national security protocols were being followed at the property after Trump and Abe dealt with a North Korean missile launch in the club's dining room.

In March, congressional Democrats introduced a bill to force disclosure of the names of visitors meeting with Trump and other administration officials at the club and at Trump Tower in New York.

The club was a frequent stop for Trump even during his campaign for the White House. He used it to host fundraisers, press conferences and victory rallies for his primary wins. Since his inauguration, he's visited Mar-a-Lago seven times. According to the State Department posting, by using the club for official business, "Trump is belatedly fulfilling the dream of Mar-a-Lago's owner and designer."

## AP:  State Department Removes Promotion Of Trump's Mar-a-Lago
### By Julie Bykowicz

WASHINGTON (AP) — The U.S. State Department has removed its promotional posting about President Donald Trump's Florida resort, after a storm of ethics criticism Monday.

In an April 4 blog post that was republished by several U.S. embassies abroad, Mar-a-Lago was described as "Trump's Florida estate," where he has hosted foreign leaders. "By visiting this 'winter White House,' Trump is belatedly fulfilling the dream of Mar-a-Lago's original owner and designer," the post said.

Left unsaid: Mar-a-Lago is part of Trump's business empire. After his election, the resort doubled its membership fee to $200,000. As president, Trump has visited the property seven times, and its restaurant fills up when he's in town.

The State Department said late Monday that its intention was "to inform the public about where the president has been hosting world leaders" and that it regrets "any misperception." That statement now appears in place of the original blog post.

The White House did not respond to questions about whether it had any involvement in the original posting or the decision to take it down.

The post originated on "Share America," a State Department project. Its website describes its mission as "sharing compelling stories and images that spark discussion and debate on important topics like democracy, freedom of expression, innovation, entrepreneurship, education, and the role of civil society."

Other topics on the Share America page include a new U.S. coin honoring Frederick Douglass, debate over the Confederate flag and news about first lady Melania Trump's participation in the State Department's International Women of Courage award ceremony.

The Mar-a-Lago post was nearly three weeks old but gained traction Monday when several people noticed the U.S. embassy to the United Kingdom was featuring it. Sen. Ron Wyden, an Oregon Democrat, asked on Twitter why taxpayers are "promoting the president's private country club" and referred to the incident as "kleptocratic."

Norman Eisen, who was President Barack Obama's chief ethics attorney, said the promotion is "exploitation."

Eisen compared it to White House counselor Kellyanne Conway's promotion of Ivanka Trump's clothing business, for which she was "counseled" but not otherwise reprimanded by the White House.

"This idea of using government for private gain is metastasizing," Eisen said. "It must be stopped."

On Twitter, Richard Painter, who served in an ethics role for President George W. Bush, called the State Department post "Use of public office for private gain pure and simple."

Starr, Katherine L.          NO DISCERNIBLE CLASSIFICATION

Stein Declaration
Civil Action No. 18-cv-00390
Exhibit 8

C06630568   U.S. Department of State   Case No. F-2017-12470   Doc No. C06630568   Date: 09/12/2018

NO DISCERNIBLE CLASSIFICATION

Eisen, Painter and other attorneys have sued Trump, alleging violation of the "emoluments clause" of the U.S. Constitution. That provision says the president may not accept foreign gifts or payments without the consent of Congress.

The Trump Organization argues that prohibition wasn't intended to cover fair-market exchanges.

**RELEASE IN FULL**

## Foreign Aid

### Foreign Policy: The End of Foreign Aid As We Know It
### By Bryant Harris, Robbie Gramer, Emily Tamkin

President Donald Trump's vow to put "America first" includes a plan to drastically cut assistance to developing countries and merge the State Department with USAID, according to an internal budget document and sources.

The administration's March budget proposal vowed to slash aid to developing countries by over one-third, but contained few details. According to a detailed 15-page State Department budget document obtained by Foreign Policy, the overhaul also includes rechanneling funding from development assistance into a program that is tied closely to national security objectives.

The document details how the Trump administration's plans to reduce direct foreign assistance would take place in fiscal year 2018.

Acting USAID Administrator Wade Warren told employees at a recent staff meeting that administration officials are considering folding the agency into the State Department as part of a review mandated by President Trump's March 13 executive order on streamlining the executive branch, according to a source within USAID. The order instructs the head of each agency to submit a plan to the Office of Management and Budget director, Mick Mulvaney, "to reorganize the agency, if appropriate, in order to improve the efficiency, effectiveness, and accountability of that agency."

While the order appears to give USAID's administrator some discretion in the reorganization plan, the White House's 2018 budget proposal points to a preference for consolidating the two entities, stating "the need for State and USAID to pursue greater efficiencies through reorganization and consolidation in order to enable effective diplomacy and development."

Such a move would not be unprecedented. In 1999, the U.S. Information Agency, which funded information and cultural programs abroad, was closed down and many of its programs folded in the State Department. But shutting down, or even just scaling back, an agency dedicated to issues like disease prevention and food security could prove far more polarizing.

"That will end the technical expertise of USAID, and in my view, it will be an unmitigated disaster for the longer term," said Andrew Natsios, the former USAID Administrator under President George W. Bush. "I predict we will pay the price. We will pay the price for the poorly thought out and ill-considered organization changes that we're making, and cuts in spending as well."

Given the steep bipartisan opposition to slashing foreign assistance, Congress likely will not consent to the entire proposed reduction. Republican Senator Lindsey Graham went as far as to declare Trump's budget "dead on arrival."

Nonetheless, aid experts still expect the final budget passed by Congress to lower spending levels on assistance.

The State Department and USAID declined to comment on potentially merging the two entities, and noted that the White House will release a more detailed budget later this spring. Nonetheless, a USAID spokesperson said "we intend to make the best use of U.S. taxpayer dollars by eliminating programs and prioritizing resources that most advance America's interests."

Senior USAID officials have told staff that the agency is attempting to cope with the steep cuts by prioritizing its field offices abroad over its offices in Washington. Nonetheless, the agency still anticipates that the budget proposal will necessitate eliminating 30 to 35 of its field missions while cutting its regional bureaus by roughly 65 percent. USAID currently operates in about 100 countries.

"What you're basically doing is eviscerating the most important tool of American influence in the developing world, which is our development program," said Natsios. "I don't think they understand what the role of USAID is, what USAID's mission directors are. USAID's mission directors are among the most influential foreigners in the country."

Stein Declaration
Civil Action No. 18-cv-00390
Exhibit 9

Starr, Katherine L.                NO DISCERNIBLE CLASSIFICATION

C06630866 U.S. Department of State Case No. F-2017-12470 Doc No. C06630866 Date: 09/12/2018

RELEASE IN FULL

## ShareAmerica Mar-A-Lago Article

**The intention of the article was to inform the public about where the President has been hosting world leaders. We regret any misperception and have removed the post.**

**Q: How did this happen? What is ShareAmerica?**

- ShareAmerica, a digital platform of the State Department Bureau of International Information Programs (IIP), advances U.S. foreign policy by providing U.S. missions abroad with social media content to engage foreign audiences. Their stories focus on aspects of U.S. society, culture, and life. These stories help foreign audiences learn more about the United States, including through stories about places they may have heard mentioned in the news. As part of this mandate, we have published stories like "How much do you know about U.S. presidents?" "How presidents leave their mark on the Oval Office", and "Secretaries of State hail from many walks of life."

- Individual posts overseas feature ShareAmerica content as they deem most effective for engaging local audiences.

**Q: How much taxpayer money was spent on this posting?**

- This article was researched and written by staff members of the IIP bureau, and provided at no cost to the State Department's diplomatic posts overseas.

**Q: Was this vetted by any ethics lawyers?**

- This article was researched and written by staff members of the IIP bureau, and provided at no cost to the State Department's diplomatic posts overseas.

- As a general matter, IIP content generated for ShareAmerica is not reviewed outside of IIP. Moving forward, we will consider whether any additional review of this content is appropriate.

- The intention of the article was to inform the public about where the President has been hosting world leaders. We regret any misperception and have removed the post.

Stein Declaration
Civil Action No. 18-cv-00390
Exhibit 10

C06630866  U.S. Department of State  Case No. F-2017-12470  Doc No. C06630866  Date: 09/12/2018

**Q: Was the White House aware of this article?**

* No. The White House was unaware of, and did not solicit, this content.

**Q: How many posts utilized this content?**

* One post, Embassy London, posted this article to its website. About 25 others used the article on various other social media platforms.

**Q: When will the social media posts promoting the blog be removed, as well as the posts by other embassies on their own sites?**

* Embassy London has removed the story from its website. The rest of the postings are on State Department social media properties, and now link to an explanatory statement.

UNCLASSIFIED  U.S. Department of State  Case No. F-2017-12470  Doc No. C06630866  Date: 09/12/2018

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

BENJAMIN WITTES,                              )
                                             )
        Plaintiff,                       )
                                             )
        vs.                              )     Civil Action No. 18-0390 (EGS)
                                             )
UNITED STATES DEPARTMENT                      )
OF STATE,                                     )
                                             )
        Defendant.                       )
_____ )

## <u>ORDER</u>

Based upon consideration of Defendant's Motion for Summary Judgment, filed on

November 21, 2018, and the entire record as a whole, and for good cause shown, it is hereby

ORDERED that:

    1.     Defendant's Motion is GRANTED;

    2.     Judgment is granted in favor of Defendant on all counts of the Complaint; and

    3.     The Clerk of Court is directed to CLOSE this case.

SO ORDERED this _____ day of _____, 2019.


_____
JUDGE EMMET G. SULLIVAN